Robert K. JOINER and Karen P. Joiner

v.

**GENERAL ELECTRIC COMPANY**
Westinghouse Electric Corporation,
and Monsanto Company.

Civ. No. 1:92–CV–2137–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 16, 1994.

Michael J. Warshauer, Burge & Wettermark, Atlanta, GA, for plaintiffs.

Anthony L. Cochran, Gary Gage Grindler, Chilivis & Grindler, Atlanta, GA, for defendant General Elec. Co.

David H. Flint, Alexander Jackson Simmons, Jr., Schreeder Wheeler & Flint, Atlanta, GA, for defendant Westinghouse Elec. Corp.

Joseph Claude Freeman, Jr., Joanne Beauvoir Brown, Freeman & Hawkins, Atlanta, GA, for defendant Monsanto Co.

## ORDER

ORINDA D. EVANS, District Judge.

This diversity action is before the court on Defendants' joint motion for summary judgment, Defendants' request for oral argument on their motion for summary judgment, Plaintiffs' request for oral argument on Defendants' motion for summary judgment, and General Electric Company's motion requesting supplemental brief. Plaintiffs have filed a response in opposition to Defendants' motion for summary judgment; Plaintiffs' time to respond to the motion requesting supplemental brief has not yet expired.

Unless otherwise noted, the evidence of record shows that the following facts are not in dispute: Robert K. Joiner ("Joiner") was born on February 9, 1954. Joiner smoked cigarettes for approximately eight years. He quit in 1980 or 1981. For the last two to three years before he quit, Joiner smoked one pack of cigarettes a day. Both of Joiner's parents smoked around Joiner while he was growing up. Joiner's father, who died when Joiner was 12, smoked throughout the time Joiner knew him. Plaintiff's mother, who died of lung cancer when Joiner was 23, smoked up to the time of her death. Joiner's maternal uncle also died of lung cancer.

Since 1973, Joiner has worked for the City of Thomasville, Georgia ("City") in the City's Water & Light Department. For the last seven to eight years, Joiner has held the title of Chief Electrician. As an incident of his job Joiner has frequently worked with and around the City's electrical transformers and voltage regulators. Joiner testified that work on electrical transformers consumed 40 to 50% of his time, while work on voltage regulators took 1% of his time.[1]

As a rule, a transformer is filled with a "dielectric fluid" that both cools and insulates the mechanism inside the transformer. This fluid typically has been a petroleum-based, flammable mineral oil. However, transformers filled with flammable mineral oil present a fire hazard when used in certain locations. Relatively early in this century a fire-resistant dielectric fluid was developed that did not contain mineral oil. Polychlorinated biphenyls ("PCBs"), a man-made chemical, were one component of the fire-resistant fluid. However, the PCB-based dielectric fluid was never widely used; "[t]he EPA has estimated that less than two-tenths of a per-

cent (0.2%) of all utility transformers were PCB transformers. See 47 Fed.Reg. 17426, 17428 (1982), 'Polychlorinated Biphenyls (PCBs): Use in Electrical Equipment.'" (Defendants' Joint Memorandum in Supp. of Summ.Judg. ["Defendants' Brief"] at 6.)

With limited exceptions, Congress banned the production and sale of PCBs on January 1, 1978. 15 U.S.C. § 2605(e)(2)(A). Congress took this action because in its view PCBs "present an unreasonable risk of injury to health or the environment." See 15 U.S.C. § 2605(a).

Monsanto manufactured PCBs from 1935 to 1977.[2] General Electric Company ("GE") and Westinghouse Electric Corporation ("Westinghouse") manufacture both transformers and fire-resistant fluid. From the 1930s to the 1970s, both GE and Westinghouse marketed fire-resistant fluid containing PCBs; GE's product carried the trade name "Pyranol," while Westinghouse's carried the trade name "Inerteen."

Throughout the time of Plaintiff's employment, all of the City's transformers have used mineral oil-based dielectric fluid, which should be free of PCBs. However, beginning in 1983, the City discovered, via systematic testing, that the dielectric fluid in some of its transformers was contaminated with PCBs.[3] From 1983 to 1993, the City tested approximately 2,668 of its transformers.[4] Approximately half of the transformers tested showed PCB contamination. However, the EPA considers any transformer that contains PCBs at a level less than 50 ppm to be a "non-PCB transformer" which is not subject to regulation. 40 C.F.R. § 761.3 (1993). Of all the transformers tested, about 2.5% contained levels of PCBs above 500 parts per

---

**1.** For ease of reference, the court hereafter uses the terms "transformer" or "transformers" for both electrical transformers and voltage regulators.

**2.** *Plaintiffs assert, without contradiction from Defendants, that after 1935 Monsanto was the* sole manufacturer of PCBs in the United States.

**3.** Defendants assert that
[a]lthough there are several methods by which this contamination could have occurred, including through maintenance and repair, the source of the PCB contamination is not an

issue in this motion for summary judgment, which is limited to the causal connection, if any, between PCBs and Mr. Joiner's small cell lung cancer.
(Defendants' Brief at 6 n. 7.)

**4.** The court reached this figure using the computer printout that is attached to the affidavit of Mark Homyk, the City's Director of Engineering and Electrical Operations. Neither side has cited to the court evidence regarding the total number of transformers the City possesses.

million ("ppm"), while about 16.7% contained levels above 50 ppm.[5] Thus, almost one out of every five (i.e., 19.2%) of the transformers the City tested presented a PCB hazard.

When a transformer was in need of repair, it was ... Joiner's duty to open it up, drain out the dielectric fluid, bake the core of the transformer dry of dielectric fluid, make repairs which were within his skills, refill the transformer with fresh mineral oil dielectric fluid, and then test the transformer for proper operation. The process of repairing transformers required that ... Joiner stick his hands and arms into the dielectric fluid to perform necessary repairs and disassembles. The next step required the separation of the core of the transformer from the tank so that it could be dried, cleaned, inspected and repaired. This step also exposed ... Joiner to the dielectric fluid....

In order to dry the transformer, a process called "baking out" was followed. During the baking out process, the dielectric fluid which covered the core after it was untanked was baked off the transformers, for several days at a time, with the intense heat of football field lights, to the point of smoking, until the core was dry. Baking out is a recommended maintenance practice.

(Plaintiffs' Brief in Opp. to Defendants' Motion for Summ.Judg. ["Plaintiffs' Brief"] at 20–21.)[6]

In 1991, at the age of 37, Joiner was diagnosed with lung cancer. Defendants assert that Joiner's ailment is of a variety known as "small cell lung cancer." In response, Plaintiffs argue that "a description of the particular cancer as being 'small cell' cannot be admitted as lung cancer cannot readily be catalogued this simply." (Plaintiffs' Response to Defendants' Statement of Material Facts, etc., ¶ 8.) Plaintiffs offer no evidence to support their objection. Moreover, through the affidavit of Joanne Beauvoir Brown, counsel for Monsanto Company ("Monsanto"), Defendants have submitted a pathology report that contains the following diagnosis:

We performed routine H & E staining on one slide and immunohistochemical staining for cytokeratin, T-cell antigen (UCHL) and B-cell antigen (L26) on the others. The routine H & E stained slide shows a poorly differentiated malignant tumor present within soft tissue. There is extensive crush artifact that makes interpretation difficult. However, the tumor is composed of small cells with dispersed nuclear chromatin pattern and scant cytoplasm. The cells infiltrate between adipose tissue and lack cohesion. The differential diagnosis on the routine stain is between a small cell carcinoma and a lymphoblastic lymphoma. Our immunohistochemical stains show weak staining in the cells for cytokeratin and negative staining for the lymphoid markers. These findings confirm the epithelial nature of the tumor and support a diagnosis of small cell carcinoma.

(Brown Aff., Ex. A.) Given this evidence, the court finds that there is no genuine dispute over the fact that Joiner suffers from small cell lung cancer.

Dr. Arthur L. Frank (M.D.) is one of Plaintiffs' experts. His affidavit provides in part as follows:

Lung cancer, like other cancers, begins with an initiated cell. The initiator can be any number of things including, but not limited to, tobacco smoke. An initiated cell does no harm by itself until it is promoted. An initiated cell can survive for a number of years without any harmful effects on the body. There are a wide variety of known and suspected promoters of lung cancer.

Epidemiology studies and statistics, and my own personal observations and experience, indicate that lung cancer is extreme-

---

**5.** One of the transformers tested (which neither GE nor Westinghouse had manufactured) contained PCBs at the level of 1,880 ppm. This was the highest reported level for any of the City's tested transformers.

**6.** During his deposition, Joiner testified that dielectric fluid got all over him at times. (Joiner Dep. at 95.) He also testified that he had swallowed a small amount of dielectric fluid when it splashed into his mouth, *id.* at 102, and that dielectric fluid had splashed into his eyes on several occasions, *id.* at 103.

ly rare for a thirty seven year old white male in the United States. This is true even for persons with a history of tobacco use. Lung cancer, as a general rule, is not seen until much later in life.

. . . .

... It is more likely than not, given Mr. Joiner's limited tobacco use, and also considering his second hand tobacco smoke exposure, and given his age at the onset of lung cancer, 37 years, that tobacco smoke served only as the initiator of the cancer and that some other agent served as the promoter of the initiated cells. It was the promotion of the initiated cells which caused Mr. Joiner to be harmed.

(Frank Aff., ¶¶ 5, 6, 8.) Plaintiffs' theory, as stated by their experts, is that PCBs and their derivatives—polychlorinated dibenzofurans ("PCDFs" or "furans") and polychlorinated dibenzodioxins ("PCDDs" or "dioxins")—served as promoters of Joiner's lung cancer.

On August 5, 1992, Plaintiffs filed this action in the State Court of Fulton County, Georgia. Defendants timely removed the action to this court. The complaint contains the following counts:

Count One—Strict liability against GE and Westinghouse.

Count Two—Negligence against GE and Westinghouse.

Count Three—Fraud against GE and Westinghouse.

Count Four—Strict liability against Monsanto.

Count Five—Negligence against Monsanto.

Count Six—Loss of consortium against all Defendants.

Count Seven—Punitive damages against all Defendants.

On August 24, 1993, Plaintiffs, with leave of court, amended their complaint. This amendment made Count Seven a claim of battery against all Defendants, while the punitive damages claim became Count Eight.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on Defendants' motion, the court must view the evidence in a light most favorable to Plaintiffs. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). To prevail on their motion for summary judgment, Defendants must show that the evidence is insufficient to establish an essential element of Plaintiffs' case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). If Defendants make a sufficient showing, then Plaintiffs "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). If the evidence supporting Plaintiffs' claims is insufficient for a jury to return a verdict for Plaintiffs, or is merely colorable or not significantly probative, then Defendants are entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If, however, reasonable minds could differ as to the import of the evidence, and a reasonable interpretation of the evidence could lead to a verdict for Plaintiffs, then summary judgment is inappropriate. *Id.* at 251–52, 106 S.Ct. at 2511–12.

Defendants offer two grounds in support of their motion for summary judgment: One ground is that Joiner did not suffer significant exposure to PCBs, furans, or dioxins. The other ground is that "plaintiffs ... cannot present credible, admissible scientific evidence that ... small cell lung cancer in humans can be caused or promoted by PCBs." (Defendants' Brief at 10.) In light of these arguments, the court first must determine if there is a genuine dispute over the allegedly-carcinogenic substances to which Plaintiffs assert Joiner was exposed. Second, the court must determine if Defendants are correct in arguing that Plaintiffs cannot show a link between PCBs and small cell lung cancer.

*EXPOSURE*

■ Defendants first argue that Joiner was not exposed to significant amounts of PCBs and, even if he was, that he did not receive a harmful dose. Defendants offer the following explanation of the difference between the terms "exposure" and "dose":

> In toxicology, "dose" or "intake" indicates the amount of chemical that is actually absorbed into the body. "Exposure" means the eligibility or potential to have contact with a particular chemical. The fact that one may have been potentially exposed to a chemical such as PCBs does not prove that one has absorbed a dose of PCBs.

(Defendants' Brief at 4 n. 4.) Defendants make several arguments in support of the exposure/dose ground of their motion for summary judgment:

> 1. Joiner's exposure to transformers that presented a PCB hazard was episodic, not daily, from 1973 to sometime between 1983 and 1987.
>
> 2. All of the transformers the City purchased were filled with mineral oil-based dielectric fluid.
>
> 3. Only one out of five of the City's transformers presented a PCB hazard.
>
> 4. Plaintiffs' test of the PCB content of Joiner's adipose tissue revealed a PCB level of 0.3 ppm, while Plaintiffs' experts testified that the average PCB level in North America for persons without any occupational exposure to PCBs is 0.4 or 0.5 ppm.[7]

The evidence Defendants rely upon to argue that Joiner was not exposed to PCBs can as easily be viewed as follows: Joiner has worked for the City for many years; at least 512 of the City's transformers (i.e., 19.2% of 2668 transformers tested) presented a PCB hazard; and disassembly of transformers was a routine part of Joiner's work. Given this view of the facts, the court finds that Defendants' first three arguments do nothing more than show the need for a jury to weigh and then choose one of the conflicting interpretations that each side advances for the same evidence.

Further, Plaintiffs accurately note two problems with Defendants' fourth argument. First, Plaintiffs point out that while the results of Joiner's adipose tissue test do not show a higher than normal ppm level, the results do, in fact, show that Joiner has been exposed to PCBs. Second, through the affidavit of Dr. Arnold Schecter (M.D.), one of their experts, Plaintiffs contend that the existence of Joiner's cancer, the treatment of the cancer, and the passage of time together make unreliable the low level that the adipose tissue test shows:

> No study has been documented that examines subjects who have both experienced weight loss associated with cancer, chemotherapy associated with cancer, and radiation therapy associated with cancer, as well as been subjected to excessive PCB, dioxin or dibenzofuran exposure. As a result, there is no control group to which Robert Joiner can be compared....
>
> Adipose levels which are low do not mean that higher levels did not exist at earlier times. This is because PCBs are metabolized and excreted from the body over time.

(Schecter Aff., ¶ 22.) Defendants attack Dr. Schecter's affidavit as inconsistent with his deposition and also offer the testimony of their own expert in rebuttal to Dr. Schecter's position.[8] In doing this, Defendants succeed

---

**7.** Neither party has cited to the court evidence regarding the definition of "adipose tissue." A commonly-used dictionary defines the term as "animal tissue in which fat is stored, consisting of connective tissue with the cells distended by droplets of fat and constituting the fat of meat." *Webster's Third New International Dictionary* 26 (Merriam–Webster 1986). The court takes judicial notice of this definition. *See* Fed.R.Evid. 201(b), (c).

**8.** In this context, a "congener" is "a chemical substance related to another (as a derivative or an element in the same group of the periodic table as another element)." *Webster's Third New International Dictionary* 478 (Merriam–Webster 1986). The court judicially notices this definition. *See* footnote 7, *supra*. Dr. Schecter responded in the affirmative when asked whether the congeners of higher-chlorinated PCBs remain at a relatively constant level for several years in human adipose tissue. (Schecter Dep. at 107.) At another point, Dr. Schecter testified that "I do have an opinion that the metabolism is going to be altered and there are—obviously will be transfer and changes. *How they will be re-*

only in showing a dispute in the evidence, not the absence of evidence.

In view of the foregoing discussion, the court finds that a genuine dispute exists over whether Joiner was exposed to PCBs. Thus, Defendants are not entitled to summary judgment on this issue. It remains to be seen if there is a genuine dispute on the furans/dioxins issues.

■ Defendants make the following arguments to show the absence of evidence that furans and/or dioxins were in the PCBs to which Joiner allegedly was exposed:

(1) [T]here is no analytical test data that any of Thomasville's transformers or voltage regulators ever contained any PCDFs or PCDDs (Schecter Depo., at 86); (2) plaintiffs had Mr. Joiner's adipose tissue analyzed for the presence of PCDFs and PCDDs, and demonstrated that his body levels for both were virtually nondetectable and well below background levels (Robertson Depo., Exhibit 7);[9] (3) there is no scientific evidence that PCDDs are created from PCBs under any conditions (Rouse Depo., at 86);[10] (4) Dr. Schecter does not know whether the formation of PCDFs from PCBs would be inhibited or reduced by the dilution of PCBs in mineral oil (Schecter Depo., at 133–134); and (5) Dr. Schecter does not know the temperature or other conditions necessary to generate PCDFs from PCBs (Schecter Depo., at 133).

(Defendants' Brief at 24.) The court first addresses the furans issue.

Defendants' first argument is correct. Plaintiffs can point to no test data that shows the existence of furans or dioxins in any of the City's transformers.

Defendants' second argument is also correct. Plaintiffs do not dispute that the adipose tissue test showed negligible levels of furans and dioxins. Even though they arranged to have the test conducted, Plaintiffs now contend that the test results should be disregarded because the testing agency used an inappropriate methodology and there is no control group against which to compare the results. (Plaintiffs' Brief at 25–26.) Dr. Schecter supports this contention. (Schecter Aff., ¶ 22.)[11]

Defendants' fourth argument is substantially accurate. During his deposition, Dr. Schecter testified that he did not recall any studies which showed that mineral oil inhibits or reduces the formation of furans from PCBs. (Schecter Dep. at 133.) Both Doctors Brown and Rouse testified that the production of furans from PCBs would be inhibited if the PCBs were diluted in mineral oil. (Brown Dep. at 24–25, 31; Rouse Dep. at 40–41.)

Defendants' fifth argument is not totally accurate. Dr. Schecter testified that in temperatures between 200 and 600 degrees centigrade "you get a yield of PCBs being

*flected in these tests, I don't know." Id.* at 30–31 (emphasis added). Dr. John F. Brown, Jr. (Ph. D), one of Defendants' experts, testified that

the level of PCB's and PCDF's were both within the lower part of the range normally involved in environmentally exposed populations, that there were no obvious abnormalities that might have resulted from accelerated clearance, that the homologue distribution in the PCB's were again very similar to what we and many others have seen in background populations.

(Brown Dep. at 87.)

**9.** Dr. Larry Robertson (Ph.D.) is one of Plaintiffs' experts.

**10.** Dr. Thomas O. Rouse (Ph.D.) is one of Defendants' experts.

**11.** Dr. Schecter's affidavit reads in part as follows:

I discussed the techniques followed by Triangle Laboratories with the chemist who conducted the tests. I believe mistakes were made. I do not believe that a reasonable scientist could use these results to compare Robert Joiner to other humans. The results show no detectable levels of PCDDs in Robert Joiner's blood for congeners which are known to exist at detectable levels in adults in North America. This casts considerable doubt on the methodology followed and further convinces me that no reasonable and experienced dioxin medical scientist would rely on them.

(Schecter Aff., ¶ 22.) In their reply, Defendants assert that "it is hardly appropriate scientific methodology to obtain adipose tissue measurements, then claim they are unreliable because they do not show what you hoped they would." (Defendants' Joint Mem. in Reply to Plaintiffs' Brief in Opp. to Defendants' Motion for Summ. Judg. ["Defendants' Reply"] at 3 n. 4.)

empirically converted to a reasonabl[y] larger yield of dibenzofurans." (Schecter Dep. at 115.) However, Dr. Schecter declined to state, even after repeated questioning, what the minimum temperature is for the formation of furans from PCBs. *See id.* at 115–18.[12]

The court finds Defendants have made a satisfactory showing that there is insufficient evidence to establish that Joiner was exposed to furans or dioxins. Plaintiffs thus "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)).

■■■ Plaintiffs first argue that PCBs are always contaminated with furans. In support of this position, Plaintiffs offer a number of citations to learned treatises. (*See* Plaintiffs' Brief at 14–15.)[13] This purported evidence is unavailing. Evidence offered in connection with a motion for summary judgment, whether contained in an affidavit or otherwise, must be admissible. Rule 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge [and] *shall set forth such facts as would be admissible in evidence....*") (emphasis added); *Aguilera v. Cook County Police & Corrections Merit Bd.*, 760 F.2d 844, 849 (7th Cir.) ("Sworn testimony is not the only basis on which summary judgment may be granted; 'the court may consider any material that would be admissible or usable at trial.' 10A

Wright, Miller & Kane, Federal Practice and Procedure § 2721, at p. 40 (2d ed. 1983) (footnote omitted)."), *cert. denied,* 474 U.S. 907, 106 S.Ct. 237, 88 L.Ed.2d 238 (1985). The learned treatises, being hearsay, are inadmissible.[14]

Plaintiffs next assert that furans are created from PCBs in fire conditions. This argument ties in with Defendants' efforts to establish the minimum temperature at which furans are converted form PCBs. The argument is relevant because Joiner testified that some of the transformers he worked on required service because they had caught on fire. Moreover, as noted earlier the City used stadium lights to "bake out" transformer cores.

Plaintiffs again cite to learned treatises to show that furans can be generated when PCBs are exposed to fire. However, Plaintiffs also cite Dr. Schecter's affidavit to support their argument:

PCBs are very similar chemicals to dioxins and dibenzofurans, which are also very toxic synthetic chemicals. They are frequently found together.... We learned from Christopher Rappe and H.R. Buser, European chemists, that when PCBs burn in the presence of oxygen they form much of the more toxic dibenzofurans and some dioxins. When the chlorinated benzenes sometime found in PCB transformer fluid burn, they yield higher amounts of dioxins and lesser amounts of dibenzofurans. Dibenzofurans are usually found in PCB

---

**12.** By seeking to establish the minimum temperature for the conversion of furans from PCBs, Defendants obviously aim to show that neither transformer fires nor the baking out process would have generated a temperature high enough for such conversion. Dr. Brown testified that furans could be generated from PCBs if the PCBs were exposed to temperatures of 300 degrees centigrade for several days. (Brown Dep. at 38.) Defendants do not cite direct evidence regarding the temperatures that were reached during a transformer fire or the baking out process. Instead, they attempt to show that no one would have sought to reach furan-generating temperatures during the baking out process, because to do so would have damaged the paper insulation contained in the transformer core. (Rouse Dep. at 85 ["(I)t seems ... very unlikely that paper would survive temperatures of 300 degrees without charring, blacking...."].) As for lightning, Dr. Rouse testified that it would be

"quite unlikely" for a lightning strike to cause the production of furans from PCBs. *Id.* at 84.

**13.** For example, Plaintiffs quote an article from a medical journal for the proposition that "'[a]ll commercially produced PCBs are contaminated with the polychlorinated dibenzofurans.'" (Plaintiffs' Response at 15 [quoting Gideon Letz, *The Toxicology of Polychlorinated Biphenyls—An Overview for Clinicians*, 138 West J.Med. 534, 540 (1983)].) Plaintiffs have not provided the court a copy of this article.

**14.** It is true that learned treatises are saved from exclusion as hearsay when an expert relies on them in giving his opinion, Fed.R.Evid. 803(18), yet Plaintiffs have not cited to the court expert testimony that supports the expansive proposition they advance.

transformer fluids, as reported in numerous reports and at many scientific meetings. In the Binghamton, New York transformer fire, we found PCBs, dibenzofurans and dioxins in the soot and in the air after the fire.

(Schecter Aff., ¶ 19.)

The court is troubled by the fact that Dr. Schecter is a medical doctor, not a chemist like Doctors Rouse and Brown. *Cf.* Fed. R.Evid. 702 (A person qualifies as an expert "by knowledge, skill, experience, training, or education."). Nevertheless, even accepting Dr. Schecter's testimony that furans can be produced from PCBs at 200 degrees centigrade, Plaintiffs have not carried their burden of showing a genuine dispute on the furans issue.

It is not enough for Plaintiffs to show that furans can be created when PCBs are exposed to a certain temperature. It is also Plaintiffs' task to link that evidence to the facts of this case, i.e., to show some credible evidence that the City's transformers were exposed to a temperature hot enough to generate furans. Plaintiffs' argument in this regard is as follows:

> When the transformers came into the shop, they were often still smoking from having been on fire. (Robert Joiner Deposition at 115–116). The dielectric fluid which had been on fire remained heated, smoky, and steamy.... During the bake out process, "[s]moke would boil off them and in the same area where we worked." (Robert Joiner Deposition at 113).... On occasion, the metal parts of the transformers would turn red hot.

(Plaintiffs' Brief at 22–23.) Essentially, Plaintiffs argue that because the transformers got hot, there is a genuine dispute on the furans issue. The court disagrees; at a minimum, Plaintiffs must produce expert testimony to show that the transformer fires or baking out process produced temperatures of at least 200 degrees centigrade. Plaintiffs have not cited such evidence to the court. The court thus finds that the evidence Plaintiffs have produced is insufficient to allow a

jury to determine that Joiner was exposed to furans. *See Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510 (if evidence supporting nonmoving party's claims is insufficient for a jury to return a verdict for him, or is merely colorable or not significantly probative, then moving party is entitled to summary judgment).

Defendants' straightforward argument on the dioxins issue is based on the following testimony by Doctors Rouse and Brown:

> Q Can [PCDDs] be created ... in a PCB contaminated transformer, meaning for my question, less than 1000 parts per million in mineral oil as a result of any foreseeable lightning strikes, fire, excessive heat, electrical arcing?

> A There is no evidence that PCDDs are created from PCBs under any conditions.

(Rouse Dep. at 86.)

> Q. Do you believe there is any association between PCDD and PCB; that is, a PCB in any fashion—sunlight, aging, fire—anything that can convert PCB's to PCDD's?

> A. I do not believe so.

(Brown Dep. at 24.)

The court finds that this is sufficient evidence to warrant summary judgment in Defendants' favor on the dioxins issue. Thus, the burden shifts to Plaintiffs to show a *genuine dispute on the existence of dioxins in the dielectric fluid* at issue.

Plaintiffs' response to Defendants' argument is as follows:

> "Polychlorinated dibenzo-p-dioxins are not found in commercial PCBs. However, when PCBs are mixed with other chlorinated compounds, such as the chlorobenzenes used in transformers, PCDDs can be found in the case of accidental fires and during incineration." Even Defendants' expert, Dr. Brown, affirmed that PCDD could be formed from askarel products such as Pyranol.[15] (Brown Deposition at 20) It is well documented that the heating

---

15. The court judicially notices that an askarel is "a synthetic electrically insulating fluid that is noncombustible." *Webster's Third New Interna-* *tional Dictionary* 128 (Merriam–Webster 1986). *See* footnote 7, *supra.*

or burning of PCBs will create both the dibenzofurans and deadly dioxins. (Schecter Affidavit ¶ 16.)

In a February 5, 1981 incident in Binghamton, N.Y., with which Dr. Arnold Schecter, is personally familiar, a PCB transformer caught on fire. Thirteen years later, the building remains uninhabitable because of contamination by PCDFs and PCDDs formed in the fire. (Schecter Affidavit ¶ 16) Robert Joiner dealt with transformer fires on a regular basis.

(Plaintiffs' Brief at 16 [footnote omitted].)

Plaintiffs' argument is unavailing. The portion of the argument in quotation marks comes from a learned treatise and is thus hearsay for the reasons discussed earlier. While Dr. Brown did testify that dioxins can be generated from Pyranol, Plaintiffs have produced no evidence to show that Pyranol is the source of the PCB contamination in the City's transformers.[16] Contrary to Plaintiffs' argument, the cited portion of Schecter's affidavit contains no citations to any studies which show that dioxins can be generated from PCBs. Dr. Schecter's conclusory, sensationalistic description of his experience with a transformer fire in New York has little probative value given the evidentiary deficits in this case. Finally, even if Plaintiffs could show that dioxins are generated from PCBs in a high temperature situation, they still have failed (as the foregoing discussion shows) to demonstrate a genuine dispute that the transformers at issue here reached the requisite high temperature. For all of these reasons, the court finds that Defendants are entitled to summary judgment on the issue of whether Joiner was exposed to dioxins.

### PCB/SMALL CELL LUNG CANCER LINK

Defendants argue that the record contains no admissible evidence that Plaintiff Joiner's small cell lung cancer was caused by his exposure to PCB's. "When medical causation is at issue, plaintiffs must prove causation to a 'reasonable degree of medical certainty.'" *Wells v. Ortho Pharmaceutical Corp.*, 615 F.Supp. 262, 295 (N.D.Ga.1985) (Shoob, J.) (quoting *Parrott v. Chatham County Hosp. Auth.*, 145 Ga.App. 113, 115, 243 S.E.2d 269 (1978)), *aff'd, modified in part, and remanded*, 788 F.2d 741 (11th Cir.); *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). Given this standard, resolution of Defendants' motion for summary judgment largely depends on the admissibility of certain expert testimony that Plaintiffs have presented. Since the standards governing the admission of expert scientific testimony have been the subject of a recent Supreme Court case, it is helpful for the court at this point to review briefly how those standards have evolved.

In *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), the D.C. Circuit rejected the results of a primitive lie detector test with the following comment: "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*, 293 F. at 1014. Until 1993, the "general acceptance" test that *Frye* announced was "the dominant standard for determining the admissibility of novel scientific evidence at trial." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, ——, 113 S.Ct. 2786, 2792, 125 L.Ed.2d 469, 478 (1993). In *Daubert*, the Supreme Court discarded the *Frye* standard on the ground that the Federal Rules of Evidence had supplanted it. *Daubert*, 509 U.S. at ——, 113 S.Ct. at 2793, 125 L.Ed.2d at 479.[17] Specifically, the

---

**16.** Dr. Brown's testimony reads as follows:

Q. What about PCDD's from other ingredients in commercial askarels; for example, Pyranol has—trichlorobenzyne is a major constituent, about 40 percent of that; correct?
A. Yes.
Q. Can PCDD be formed from the askarel mixture which included trichlorobenzynes through fire, aging, sunlight, or any other action of which you are aware of?
A. Yes. I am aware that there have been scientific reports of the conversion of chlorobenzynes to trace quantities of PCDD's at high temperatures.
(Brown Dep. at 24.)

**17.** In *United States v. Hope*, 714 F.2d 1084 (11th Cir.1983), a panel of the Eleventh Circuit noted

Supreme Court held that Rule 702 of the Federal Rules of Evidence, not the general acceptance test, provides the governing standard when a litigant offers expert scientific testimony.

Rule 702 provides in part as follows: "If scientific ... knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Supreme Court amplified on Rule 702's requirements as follows:

> Faced with a proffer of expert scientific testimony ..., the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482 (footnotes omitted).

 In one of the footnotes omitted from the foregoing passage, the Supreme Court quotes Rule 104(a). Rule 104(a) commits to the trial court the resolution of preliminary questions regarding the admissibility of evidence. The rule states that in making this determination the court "is not bound by the rules of evidence except those with respect to privileges." The standard that guides the court as it weighs the admissibility of evidence is the "preponderance of proof." *Daubert,* 509 U.S. at —— n. 10, 113 S.Ct. at 2796 n. 10, 125 L.Ed.2d at 482 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987)).

 Defendants make a number of arguments to show that Plaintiffs cannot demonstrate a link between PCB exposure and small cell lung cancer. The strongest of these arguments is that the opinions of Plaintiffs' experts do not fit the facts in this case because the opinions are inextricably bound up with the experts' assumption that Joiner was exposed to furans and dioxins.

As discussed above, the admissibility analysis under Rule 702 has two prongs. The second prong requires that the proffered evidence "assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481. To illustrate this point, the Supreme Court commented with approval on Judge Edward R. Becker's opinion in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985):

> The consideration has been aptly described by Judge Becker as one of "fit." [*Downing,* 753 F.2d at 1242.] "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.... The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert,* 509 U.S. at ——–——, 113 S.Ct. at 2795–97, 125 L.Ed.2d at 481–82 (citations omitted).

Among other things, Defendants cite the following testimony in support of their "no-fit" argument:

> Q. Now, tell us what opinions you have reached in this case.
>
> A. I believe more likely than not that Mr. Joiner's lung cancer was causally linked to cigarette smoking and PCB expo-

---

the argument that the Federal Rules of Evidence had replaced the *Frye* standard, but found it unnecessary to resolve the issue. *Id.,* 714 F.2d at 1087 n. 3. In *United States v. Piccinonna,* 885

F.2d 1529 (11th Cir.1989), the Eleventh Circuit *en banc* appeared to endorse the use of *both* Rule 702 and the *Frye* standard. *Id.,* 885 F.2d at 1531. *Daubert* has now settled the issue.

sure. And by PCB exposure, I'm thinking also of PCBs and dioxins and dibenzofurans and related chemicals which frequently are found together in transformer fluids.

(Schecter Dep. at 61).

Robert Joiner, by occupational history, was exposed at work, for a long period of time on a regular basis to PCBs and other transformer fluid contaminants routinely, after fires and high heat incidents, and when there was heating during the repair process.... Therefore, the initiating and promoting effects of the amounts of PCBs, dioxins and dibenzofurans was certainly enough to have contributed to his lung cancer, to the best of my medical and scientific opinion.

(Schecter Aff., ¶ 21.)

Q All right. If you would, Dr. Teitelbaum, would you simply tell us what opinions you have reached in this case? [18]

A Yes. I would say I have three opinions. [First, Joiner has lung cancer.]

Secondly, it's clear that for a period of many years, Mr. Joiner worked as an industrial electrician and had exposure to various materials commonly used in the trade, including mineral oils contaminated with PCBs.

And, three, that his lung cancer was caused by or contributed to in a significant degree by the materials with which he worked.

. . . .

Q Have you been shown any documents that would reflect the presence of dibenzofurans, dibenzodioxins, or chlori-nated benzene in any of the mineral oil on which Mr. Joiner worked on or around?

A I don't have any documents which would answer that question. There are, so far as I can tell, no quantitative analyses that have been supplied to me that answer how much and when.

. . . .

Q Or if any; is that correct?

A I don't have any documents at all. I think that one simply has to look at the likely chemistry of the situation and what's known about PCBs manufactured in this period and assume that there was some furan present, that there may have been some dioxin present, depending on the particular fire and circumstance. There probably was some chlorinated benzene since that's almost always a contaminant.

(Teitelbaum Dep. at 28, 33–34.) [19]

On the basis of an overwhelming body of scientific evidence which supports the position which I have taken, that cancer is a multi-factorial disease, I have outlined the elements of causation which are identifiable from Mr. Joiner's family, personal, medical and occupational history. I have specifically listed these factors in my deposition, I believe that his family history of cancer, his personal history of exposure to cigarette smoke and perhaps to silica, his medical history and his occupational history which included exposure to polychlorinated biphenyls, their contaminants, including polychlorinated [d]ibenzofurans, mineral oil, mineral spirits and other materials together were a sufficient and probable cause of Mr. Joiner's lung cancer. In

**18.** Dr. Daniel Teitelbaum (M.D.) is one of Plaintiffs' experts.

**19.** Dr. Teitelbaum's testimony is also unhelpful because of his assumptions regarding the rate at which Joiner was exposed to PCBs during his work:

Q Now, do you know how often, if at all, the mineral oil was contaminated with PCBs?

A No, I don't know that. As I said, I understand that there are documents, but I don't know from what era.

Q All right.

A I would say that from the era that we're talking about, virtually all of the mineral oil would have been contaminated within the ranges that we're talking about. I think it would be unusual for it not to be contaminated at that time.

Q All right. So for purposes of your rendering your opinion, are you assuming that virtually all the mineral oil was contaminated with PCBs?

A Yes.

Q Okay.

A With concentrations between 50 and a few thousand parts per million during this era of time.

(Teitelbaum Dep. at 45–46.) As noted earlier, about one in five of the City's transformers presented a PCB risk.

my opinion, PCBs were a significant contributing cause to Mr. Joiner's lung cancer. (Teitelbaum Aff., ¶ 12.)

The foregoing testimony makes it clear that Plaintiffs' experts assumed Joiner was exposed to furans and dioxins.[20] Moreover, this assumption is an integral part of the foundation for the experts' opinions that PCBs contributed to Joiner's lung cancer. However, as discussed above, Plaintiffs have failed to show a genuine dispute over whether furans and dioxins were in the PCBs to which Joiner was exposed. Thus, the testimony of Plaintiffs' experts manifestly does not fit the facts of this case, and is therefore inadmissible.[21]

■ Assuming that Plaintiffs' experts had not made unfounded assumptions about furans and dioxins, Defendants still persuade the court that Plaintiffs' expert testimony would not be admissible. Defendants do this by attacking the conclusions that Plaintiffs' experts draw from the studies they cite.

■ Defendants initially argue that they are entitled to summary judgment because Doctors Robertson and Teitelbaum answered in the negative when asked if there was any credible evidence "as a scientific probability" that PCBs cause or promote small cell lung cancer in humans. (Robertson Dep. at 14; Teitelbaum Dep. at 110.) Stated another way, Defendants assert that they are entitled to summary judgment because there are no epidemiological studies which show that PCBs cause small cell lung cancer in humans. However,

"a cause-effect relationship need not be clearly established by animal or epidemiological studies before a doctor can testify that, in his opinion, such a relationship exists. As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical."

*Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.) (quoting *Ferebee v. Chevron Chem. Corp.*, 736 F.2d 1529, 1535 (D.C.Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984)), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). Thus, the absence of an epidemiological study in Plaintiffs' favor does not automatically foreclose their action.

Defendants attack the experts' reliance on animal studies with more success. Dr. Robertson testified regarding two studies of infant, suckling mice upon which Doctors Schecter and Teitelbaum relied. Defendants summarize Dr. Robertson's testimony as follows:

Dr. Robertson admitted that his opinion that PCBs are "promoting agents" is based on only two studies in infant, suckling mice. (Robertson Depo., at 14–15.) ... [A]s to those two studies, Dr. Robertson admitted that (1) the lung cancer promoted in the infant mice was not identified as small cell carcinoma (Robertson Depo., at 15), (2) he did not know whether the same effect had been produced in adult mice (Robertson Depo., at 23), (3) the tumors produced were dose-dependent, (Robert-

20. The court notes the following testimony by Dr. Schecter:

Q. What information do you have about the concentrations of PCBs, furans and dioxins in the mineral oil contained in the transformers that Robert Joiner worked around?
A. We have specific data back that came by fax yesterday, and I showed you my entire file, showing that there were PCBs in some of the mineral oil. And my general knowledge that dibenzofurans and dioxins are found in PCB-containing electrical transformer oils.
(Schecter Dep. at 84.)

21. Dr. Robertson's testimony has no utility, for he failed to identify any specific chemicals as alleged promoters of Joiner's lung cancer:

I expect, based upon of course what further information comes to me, that is I qualify my expectation on that basis, that my—my expert opinion will be that this gentleman developed lung carcinoma at a very young age because the onset of that disease was promoted, supported, accelerated by his exposure to halogenated aromatic hydrocarbons.
(Robertson Dep. at 16.) Defendants assert that the term "halogenated aromatic hydrocarbons" describes a "broad category of chemicals." (Defendants' Brief at 15 n. 14.)

son Depo., at 26), and (4) after having been administered a known initiating carcinogen, the mice were dosed with 100% PCBs by either injecting it directly into the peritoneum (the body cavity containing most vital organs) or directly into the stomach (Robertson Depo., at 27–28).[22]

A review of the two studies themselves reveals that [the] infant mice developed alveologenic adenomas, not small cell carcinomas. (Robertson Depo., Exhibits 2 & 3).[23]

(Defendants' Brief at 36.) Both Dr. Schecter and Dr. Teitelbaum relied on the mice studies in opining that PCBs promoted Joiner's lung cancer. (Schecter Dep. at 66–69; *see* Teitelbaum Dep. at 48, 78–81.)

Defendants assert that Plaintiffs' experts' reliance on the mice studies is unjustifiable because they "admittedly base their various opinions on the extrapolation of physical effects observed in laboratory test animals subjected to extremely high levels of PCBs." (Defendants' Brief at 35.) In support of this position, Defendants cite *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349 (6th Cir.1992), *cert. denied*, ——— U.S. ———, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992), which contains the following passage:

> We do not mean to intimate that animal studies lack scientific merit or power when it comes to predicting outcomes in humans. Animal studies often comprise the backbone of evidence indicating biological haz-ards, and their legal value has been recognized by federal courts and agencies. . . .

> Here, the record's explanation of the animal studies is simply inadequate. Although the animal studies themselves may have been scientifically performed, the exact nature of these tests is explained only in general terms. The record fails to make clear why the varying doses of Bendectin or doxyalamine succinate given to the rats, rabbits and *in vitro* animal cells would permit a jury to conclude that Bendectin more probably than not causes limb defects in children born to mothers who ingested the drug at prescribed doses during pregnancy. The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue of human birth defects is too wide. Under such circumstances, a jury should not be asked to speculate on the issue of causation.

*Id.*, 959 F.2d at 1360–61 (citations omitted).[24]

Defendants' argument persuades the court that Plaintiffs' experts' reliance on the mice studies is flawed for several reasons. First, there are only two studies. Second, the studies obviously used massive doses of PCBs. Finally, Dr. Teitelbaum implicitly admitted the preliminary nature of the mice studies' findings:

> Q Other than the studies by Lucy Anderson [i.e., the author of the mice studies], do you know of any other animal

---

22. Dr. Robertson testified that in one of the studies the mice were dosed with 500 milligrams of PCBs per kilogram, while in the other a range of doses (i.e., 50, 250, and 500 milligrams of PCBs per kilogram) was given. (Robertson Dep. at 26.)

23. Defendants have not cited to the court evidence regarding the definition of "adenoma." The court judicially notices that it is "a *benign* tumor of a glandlike structure or of glandular origin." *Webster's Third New International Dictionary* 25 (Merriam–Webster 1986) (emphasis added). *See* footnote 7, *supra*. Despite the fact that an adenoma is a benign tumor, Dr. Robertson testified that the mice had developed a form of cancer:

> A I know of studies, and we have identified one of them, in which PCBs promote DMN-initiated carcinoma in the lung of mice.

Q34 Is that article small cell carcinoma . . . ?
A It's not identified as such, that's correct. (Robertson Dep. at 14–15.) Though copies of the mice studies were used as exhibits during Dr. Robertson's deposition, the exhibits did not accompany the copy of the Robertson deposition that was filed with the court. Thus, the court is unable to review the studies themselves in order to clarify the confusion that exists over whether the mice in fact developed malignant tumors. However, in their brief Defendants repeatedly concede that a form of lung cancer occurred in the mice. The court thus proceeds from the standpoint that the mice did develop some type of lung cancer, but that the lung cancer was not of the small cell variety.

24. *Turpin* predates *Daubert*. However, in *Daubert* the Supreme Court referred to *Turpin* with approval. *See Daubert*, 509 U.S. at ——–——, 113 S.Ct. at 2797–99, 125 L.Ed.2d at 484–85.

study where lung cancer was promoted in a species other than mice?

A I don't think anybody's studied any other study. I think that now that the 1993 Anderson publication came out, I suspect you're going to see some more studies on that because now there seems to be a clean model that can be looked at.

(Teitelbaum Dep. at 87.) The court thus finds that Defendants have sufficiently called into question the validity of Plaintiffs' experts' reliance on the mice studies. Therefore, the burden shifts to Plaintiffs to demonstrate by a preponderance of proof that their experts' opinions are admissible.

Regarding the mice studies, Plaintiffs have chosen to proceed as if the only issue is whether animal studies can ever be a proper foundation for an expert's opinion. Plaintiffs assume Defendants' argument is that experts should never rely on animal studies as the basis for an expert opinion. However, read as a whole, that is not Defendants' argument. (*See* Defendants' Brief at 32, 33 ["Valid scientific reasons exist for scientists to exercise extreme caution when interpreting animal studies"; "[t]his is not to say that animal studies have no legitimate role in scientific research, but it is certainly a limited one."].) Plaintiffs' argument addresses the question of reliance on animal studies in general, not the deficiencies that Defendants have highlighted in the experts' reliance on the animal studies at issue here. Plaintiffs' argument, being unresponsive to the issue at hand, does not persuade the court to change its finding that Plaintiffs' experts erred in relying on the mice studies to opine that PCBs caused Joiner's lung cancer "to a 'reasonable degree of medical certainty.'" *Wells*, 615 F.Supp. at 295.

Regarding epidemiological studies, Plaintiffs take issue with Defendants' claim that no such studies support Plaintiffs' position, for they assert that their experts "identify several epidemiological studies in support of their opinions." (Plaintiffs' Brief at 46 [footnote omitted].) [25] Plaintiffs assert that the studies their experts cite "demonstrate a positive correlation between exposure to PCB and lung cancer." (Plaintiffs' Brief at 11.) However, in every case Defendants show that the studies are either equivocal or not helpful to Plaintiffs.

Plaintiffs offer selected quotes from Bertazzi, et al., *Cancer Mortality of Capacitor Manufacturing Workers*, 11 Am.J.Indus.Med. 165 (1987), in support of their position. (*See* Plaintiffs' Brief at 11.) [26] Defendants note, however, that the Bertazzi study contains the following conclusion:

> There were apparently no grounds for associating lung cancer deaths (although increased above expectations) and exposure in the plant. The numbers were small, the value of the risk estimate was not statistically significant, and such risk had never been suggested before.

25. Teitelbaum testified that he was aware of no studies which show that PCBs cause, contribute, or promote small cell lung cancer in humans. (Teitelbaum Dep. at 110–11.) Dr. Schecter confirmed that controlled studies which showed PCB to be a cancer promoter were done only on animals:

Q. Again, your opinion that PCBs, dioxins and furans operate as promoters is based upon studies of laboratory animals only, is that true?
A. The studies which tell us that PCBs, dioxins and dibenzofurans are promoters of cancer were developed through laboratory animals and we have belief that they are relevant to humans. We test them on animals. We believe that's relevant to humans.
Q. Your opinion about PCBs, dioxins and furans being promoters is based upon studies of animals?
A. Yes. And my reason for believing this is relevant to human studies is because all government agencies concerned with health believe that this is the case and that we can usually predetect, because humans also are in the animal kingdom. Human cells are nuclei, cytoplasm, mitocho[n]dria, endoplasmic reticulum and respond in similar fashion. (Schecter Dep. at 68–69.)

26. One such quote is that "[s]tudies of the metabolic fate [sic; rate?] of these substances sustain the *plausibility* of a carcinogenic action" (emphasis added). The mere plausibility of carcinogenic action does not establish causation. *See* .*Turpin*, 959 F.2d at 1360 ("[The plaintiffs' experts] testify that the animal studies show that Bendectin is 'capable of causing,' 'could cause' or its effects are 'consistent with causing' birth defects, not that it probably causes birth defects in general or that it did in this case. In short, they testify to a possibility rather than a probability.").

(Defendants' Reply at 7 [quoting Bertazzi, *supra*, at 172].)[27]

Plaintiffs offer selected quotes from Judith A. Zack & David C. Musch, *Mortality of PCB Workers at the Monsanto Plant in Sauget, Illinois* (1979), an unpublished study that Monsanto funded. (Plaintiffs' Brief at 12–13.) Defendants note that in a later version of the study (which they assert was prepared with a view toward publication) the study's authors specifically stated that "[w]hile many of the cancer-specific SMRs exceed 100, none are statistically significant." (Defendants Reply, Ex. C at 7.)[28] At least with regard to lung cancer, the original study that Plaintiffs cite essentially contains the same statement, albeit in a longer fashion:

> For all males, there were 30 deaths observed and 22.88 expected (Table 4).... The SMR for lung cancer was high at 278. The only statistically significant difference seen in this table is seen for diseases of the circulatory system, exclusive of arteriosclerotic disease. Nine deaths were observed with 3.98 expected, yielding a SMR of 226. Table 5 shows the overall SMR remains high for white males at 133.... There were 3 deaths observed from lung cancer with 0.94 expected, yielding a SMR of 319. For the category of circulatory disease, exclusive of arteriosclerotic disease, the SMR was 526 with 7 observed and 1.83 expected deaths. This difference was the only one of statistical significance in this table.

(Plaintiffs' Brief, Ex. 11 at Bates No. 003188.)

Plaintiffs assert that "[a]nother study of interest is a study of PCB exposed workers in a Norwegian cable manufacturing company. A statistically significant excess of deaths from lung cancer was observed. Ten deaths from lung cancer were observed when only 3.9 were expected." (Plaintiffs' Brief at 13.) Defendants note that the study "never mentions PCBs and does not involve 'PCB-exposed workers.' It reports a statistically significant excess of cases of lung cancer in a small cohort of cable workers exposed to mineral oil, whose exposure was also confounded by exposure to asbestos and cigarette smoke." (Defendants' Reply at 8.) The study concluded as follows:

> The present study has shown a statistically significant excess of cases of lung cancer in a small cohort of oil exposed cable workers. This result cannot be accounted for by excess smoking alone and exposure to non-severely refined, low viscosity, and high viscosity oils must be considered as an important causative factor. For reasons discussed above the results presented here are not necessarily relevant to all other types of mineral oils. Further follow up of this population and studies of other groups with well defined exposure to oils are needed before any firm conclusions may be drawn regarding the carcinogenicity of mineral oil products to the human lung.

(Defendants' Reply at 8 n. 8 [quoting Ronneberg, et al., *Mortality and Incidence of Cancer Among Oil Exposed Workers in a Norwegian Cable Manufacturing Company Part 2 Mortality and Cancer Incidence in 1953–84*, 45 British J.Indus.Med. 595, 601 (1988) ].)

The last study Plaintiffs cite is Ikeda, et al., *A Cohort Study on Mortality of Yusho Patients—A Preliminary Report*, 78 Fukuoko Acta Med. 297 (1987), which Plaintiffs assert was summarized in a publication entitled *World Health Organization's International Programme on Chemical Safety, Polychlorinated Biphenyls and Terphenyls* 449 (2d Ed.1993). The "Yusho" incident involved Japanese people who were accidentally exposed to toxic substances. The report states that " '[a] statistically significant excess mortality was seen for malignant neoplasms, cancer of the liver and cancer of the lung, trachea, and bronchi in males.' " (Plaintiffs' Brief at 13.)

---

**27.** With one exception, neither party has provided the court with a copy of the studies cited in the briefs. (The one exception is Plaintiffs' provision of the Zack & Musch study discussed below.) Thus, the court for the most part has had to rely on the excerpts from the studies that the parties have provided in their briefs.

**28.** "Ratios of observed to expected number of deaths [are] expressed as standardized mortality ratios (SMRs)." (Defendants' Reply, Ex. C at 6.)

.Defendants respond to this study as follows:

The [Ikeda] report was published in English by Kuratsune, et al., "Analysis of Deaths Seen Among Patients With Yusho—A Preliminary Report," *Chemosphere*, Vol. 16, Nos. 8/9, pp. 2085–2088 (1987). As indicated by the title, it is a "preliminary report" of an "analysis of deaths," *not* an epidemiological study. No regression analysis was done and the authors did not control for cigarette smoking, asbestos exposure, or other causes of cancer. Most significant, however, is the fact that, although the deaths were observed in Yusho patients, the authors *did not examine if the observed excess risks might be related to the intake of toxic rice oil.* Kuratsune, p. 2087.

(Defendants' Brief at 10 [emphasis in original].) Dr. Schecter's testimony reveals why the omission regarding toxic rice oil is so significant:

A. ... We have a voluminous data on human response in Yusho and Yuchem to humans exposed to PCBs, dibenzofurans and dioxins.

Q. Now, in those two incidents, the Yusho and Yuchem, in both of those [incidents], what was the concentration of PCBs, was it a 65 percent concentration, was it 650 parts per million Aroclor or some equivalent?

A. I don't remember what it was. *It was PCB and dibenzofuran and dioxin contamination of rice oil which was used to cook food.* I don't think anyone can be certain of what the intake was.

(Schecter Dep. at 91 [emphasis added].) Finally, Dr. Teitelbaum did not find much significance in the Yusho report:

Q. ... What, if any, epidemiological studies have you reviewed in reaching your opinion?

A. ....

... You've got Kuratsune's studies from Japan. You've got a few cases of lung cancer there. They're not very convincing, as the Japanese lifestyle is different. There's—it's, again, suggestive but not convincing.

(Teitelbaum Dep. at 89–90.) The limitations in the Yusho study (e.g., failure to investigate exposure to other potential carcinogens), the fact that the persons studied were exposed to furans and dioxins, and the fact that one of Plaintiffs' own experts has a low opinion regarding the relevance of the Yusho study together combine to convince the court that the study has no utility for Plaintiffs' purposes.

In *Daubert,* the Supreme Court noted that under Rule 702 "[t]he subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.,* 509 U.S. at ——–——, 113 S.Ct. at 2794–96, 125 L.Ed.2d at 480–81 (ellipsis in original) (footnote omitted). The court need not address whether the studies that Plaintiffs' experts rely upon were conducted in a scientific manner, for the studies simply do not support the experts' position that PCBs *more probably than not* promoted Joiner's lung cancer. That is, the court is not persuaded by a preponderance of proof that the studies support the "knowledge" the experts purport to have (i.e., that PCBs, "to a 'reasonable degree of medical certainty,'" *Wells,* 615 F.Supp. at 295, promote small cell lung cancer in humans). *See Turpin,* 959 F.2d at 1360 ("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue of human birth defects is too wide."); *cf. Wells,* 788 F.2d at 745 ("[T]he basic methodology employed to reach ... a conclusion [must be] sound."). The court is persuaded that the opinions of Plaintiffs' experts do not rise above "subjective belief or unsupported speculation." [29]

---

29. Summary judgment for Defendants would be in order even if the testimony of Plaintiffs' experts were admissible, for the court believes that no reasonable juror could find that PCBs caused Joiner's lung cancer given the flawed nature of Plaintiffs' experts opinions. *Cf. Elkins v. Rich-* *ardson–Merrell, Inc.,* 8 F.3d 1068, 1071 (6th Cir. 1993) ("We construe *Turpin* to treat the plaintiff's expert opinion indicating a basis of support for the plaintiff's theories in animal studies to be admissible but 'simply inadequate ... [to] permit a jury to conclude that Bendectin more probably

Plaintiffs' experts' opinions that PCBs promoted Joiner's lung cancer are inextricably bound up with their unfounded assumption that Joiner was exposed to furans and dioxins. Moreover, the court finds that Plaintiffs have failed to show by a preponderance of proof that their experts' opinions regarding the PCB/lung cancer link are admissible under the standards set out in Rule 702 and explicated in *Daubert.* Therefore, Defendants are entitled to summary judgment on all of Plaintiffs' claims.

### CONCLUSION

Accordingly, Defendants' joint motion for summary judgment [# 46–1] is GRANTED. Defendants' request for oral argument on their motion for summary judgment [# 47–1] and Plaintiffs' request for oral argument on Defendants' motion for summary judgment [# 55–1] are DENIED. GE's motion requesting supplemental brief [# 67–1] is DENIED. The Clerk is DIRECTED to enter judgment in Defendants' favor on all of Plaintiffs' claims.

SO ORDERED.

than not causes limb defects.' *Id.* at 1360.") (ellipsis and brackets in original).