United States Court of Appeals,

Eleventh Circuit.

No. 94-9131.

Robert K. JOINER, Karen P. Joiner, Plaintiffs-Appellants,

v.

GENERAL ELECTRIC COMPANY, A New York Corporation; Westinghouse Electric Corporation, A Pennsylvania Corporation; Monsanto Company, A Delaware Corporation, Defendants-Appellees.

March 27, 1996.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:92-CV-2137-ODE), Orinda D. Evans, Judge.

Before BIRCH and BARKETT, Circuit Judges, and SMITH[*], Senior Circuit Judge.

BARKETT, Circuit Judge:

Robert Joiner ("Joiner") and his wife, Karen Joiner, brought this suit in state court on August 5, 1993, seeking damages for personal injuries from lung cancer allegedly caused by Robert Joiner's exposure to polychlorinated biphenyls ("PCBs") while working for the City of Thomasville, Georgia ("City"). Monsanto, General Electric Company, and Westinghouse Electric Corporation ("defendants") removed the action to federal district court, which excluded the testimony of the Joiners' experts and granted the defendants' motion for summary judgment, which the Joiners now appeal. Because we find that the district court improperly assessed the admissibility of the proffered scientific expert testimony and overlooked evidence establishing disputed issues of fact, we reverse the summary judgment.

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

Facts

Beginning in 1973, Joiner worked as an electrician in the City's Water & Light Department, a position requiring him to work with and around the City's electrical transformers. Throughout Joiner's employment, all of the City's transformers should have used as a coolant a mineral oil-based dielectric fluid which was free of PCBs. [1] However, in 1983, the City discovered PCB contamination in the dielectric fluid used in some of its transformers. From 1983 to 1993, the City conducted tests and concluded that almost one out of every five of the transformers tested presented a PCB hazard.

When a transformer was in need of repair, it was Joiner's duty to open it, drain out the dielectric fluid, bake the core of the transformer dry of dielectric fluid,[2] make repairs, refill the transformer with fresh mineral oil dielectric fluid, and then test the transformer. These repairs required that Joiner stick his hands and arms into the dielectric fluid. Joiner testified that dielectric fluid got all over him at times, that he would swallow a small amount of dielectric fluid when it splashed into his mouth, and that dielectric fluid had splashed into his eyes on several occasions.

In 1991, at the age of 37, Joiner was diagnosed with lung

---

[1]In 1978 Congress banned the production and sale of PCBs because they "present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(a)(2)(A).

[2]Joiner followed a "baking out" process during which all remaining dielectric fluid that covered the core was baked off under intense heat for several days at a time, to the point of smoking, until the transformer core was dry.

cancer. The Joiners' theory of the case was that while Joiner's history of cigarette smoking and his family history of lung cancer may have predisposed him to developing lung cancer,[3] his exposure to PCBs and their derivatives—polychlorinated dibenzofurans ("furans") and polychlorinated dibenzodioxins ("dioxins")—served to "promote" his small cell lung cancer.[4]

Defendants moved for summary judgment on the grounds that (1) there was no admissible scientific evidence that PCBs promoted Joiner's cancer, and (2) there was no evidence that Joiner suffered significant exposure to PCBs, furans, or dioxins. The Joiners responded with the depositions and affidavits of experts who testified that PCBs alone can promote cancer and that furans and dioxins can also promote cancer, that Joiner was exposed to PCBs, furans, and dioxins, and that, in these experts' opinions, such exposure was responsible for Joiner's cancer. The district court deemed inadmissible all of the testimony presented by the Joiners' experts and granted summary judgment for the defendants.[5] In addition, although it found Joiner was exposed to PCBs, the court

---

[3]Joiner, who had smoked cigarettes for approximately eight years, stopped smoking by 1981, ten years before his doctor diagnosed his lung cancer. *Joiner v. General Elec. Co.,* 864 F.Supp. 1310, 1312 (N.D.Ga.1994). One of Joiner's experts testified that, notwithstanding Joiner's history of smoking, "lung cancer is extremely rare for a thirty seven year old white male in the United States." *Id.* at 1313-14.

[4]One of the Joiners' experts explained that cancers often begin with an initiated cell which may not do harm until promoted. A "promoter" is an agent that provokes an initiated cell to turn cancerous. *Id.* at 1313.

[5]The district court denied both the Joiners' and the defendants' requests for oral argument on the defendants' joint motion for summary judgment.

asserted that there was no credible evidence that Joiner had been exposed to furans and dioxins, and granted summary judgment against the Joiners on the question of exposure to furans and dioxins. *Joiner v. General Elec. Co.,* 864 F.Supp. 1310, 1326 (N.D.Ga.1994).

On appeal, the Joiners reassert the admissibility of their expert testimony to establish causation. They also contest the district court's grant of summary judgment on the issue of Joiner's exposure to furans and dioxins.

## Discussion

A. *Standard of Review*

We review a grant of summary judgment de novo. *Fane v. Edenfield,* 945 F.2d 1514, 1516 (11th Cir.1991), *aff'd,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).

A district court's ruling on the admissibility of evidence is reviewed for abuse of discretion. *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 37 F.3d 1460, 1463 (11th Cir.1994). Because the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals,* --- U.S. ----, ----, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469 (1993); *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d

717, 750 (3d Cir.1994). To the extent that the district court's ruling turns on an interpretation of a Federal Rule of Evidence, our review is plenary. *Id.* at 749.

B. *The Admissibility of Expert Testimony*

In 1923, *Frye v. United States* established a "general acceptance" test that guided district courts in determining when to admit scientific evidence. *Frye,* 293 F. 1013, 1014 (D.C.Cir.1923). This test required courts to exclude any novel scientific evidence not already grounded in a principle that had attained "general acceptance in the particular field" in which it belonged. *Id.*

In 1975, the Federal Rules of Evidence ("Rules") introduced a more liberal approach to the question of the admissibility of scientific evidence.[6] Rule 702, which specifically governs expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Notwithstanding the Rules, most courts continued to adhere to the "general acceptance" test.

In 1993, the Supreme Court in *Daubert,* --- U.S. at ----, 113 S.Ct. at 2793, specifically held that the Rules superseded the *Frye* "general acceptance" test. The Court made clear that the critical concerns of Rule 702 are evidentiary reliability and relevancy. *Daubert,* --- U.S. at ----, 113 S.Ct. at 2795. Thus, an expert's bald statement that he or she is imparting "scientific knowledge"

---

[6]Rule 104(a) provides that the court shall determine "[p]reliminary questions concerning ... the admissibility of evidence." Fed.R.Evid. 104(a).

does not automatically render that expert's opinion admissible. In order to best ensure relevant and reliable testimony and exclude "unsupported speculation," *Daubert* establishes a two-pronged test which requires a district court, before it may admit scientific testimony, to determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at ----, 113 S.Ct. at 2796. This "gatekeeping" role calls for the trial judge to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid, i.e., whether it is reliable; and whether that reasoning or methodology properly can be applied to the facts in issue," i.e., whether it is relevant to the issue involved. *Id.* Proffered scientific evidence must satisfy both prongs to be admissible.

Under the first prong, evidentiary reliability, the district court must examine the reasoning or methodology underlying the expert opinion to determine whether it utilizes valid scientific methods and procedures. Trial judges must evaluate scientific processes and studies with which they may not be intimately familiar, but be careful not to cross the line between deciding whether the expert's testimony is based on "scientifically valid principles" and deciding upon the correctness of the expert's conclusions. The latter inquiry is for the jury and, therefore, judges may not implicitly factor it into their assessment of reliability.

*Daubert* suggests several factors to aid federal judges in evaluating whether a particular scientific theory or study is

reliable: (1) its empirical testability; (2) whether the theory or study has been published or subjected to peer review; (3) whether the known or potential rate of error is acceptable; and (4) whether the method is generally accepted in the scientific community. *Id.* at ----, 113 S.Ct. at 2797-98. These factors are neither exhaustive nor applicable in every case. *See also Paoli,* 35 F.3d at 742. Where appropriate, they serve as indicia of the reliability of the basis of an expert's testimony.

Under the second prong, relevance, the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue. *Daubert,* --- U.S. at ----, 113 S.Ct. at 2795. In this regard, the *Daubert* Court discusses the concept of "fitness," that is, "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* at ----, 113 S.Ct. at 2795-96 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)).

In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to loosen the strictures of *Frye* and make it easier to present legitimate conflicting views of experts for the jury's consideration. *Frye* required that before an expert could testify, the proffered opinion had to be generally accepted in the pertinent field. The necessity for such broad acceptance as a condition for admissibility was

eliminated by Rule 702. The admission of scientific evidence that might not yet be generally accepted in the field, however, is contingent on a trial court's finding that such evidence is indeed scientifically legitimate, and not "junk science" or mere speculation. This gatekeeping role is simply to guard the jury from considering as proof pure speculation presented in the guise of legitimate scientifically-based expert opinion. It is not intended to turn judges into jurors or surrogate scientists. Thus, the gatekeeping responsibility of the trial courts is not to weigh or choose between conflicting scientific opinions, or to analyze and study the science in question in order to reach its own scientific conclusions from the material in the field. Rather, it is to assure that an expert's opinions are based on relevant scientific methods, processes, and data, and not on mere speculation, and that they apply to the facts in issue. Keeping *Daubert* 's lower threshold in mind, we turn to the facts of this case.

1. *Application of Daubert to this Case—Reliability*

Under the first prong of *Daubert,* the district court must identify the basis of an expert's testimony and ascertain whether the methods, procedures, and information used by the expert to reach his or her conclusion are scientifically reliable.

a. *The Basis of an Expert's Opinions*

The Joiners' chief experts were Daniel T. Teitelbaum, M.D., and Arnold Schecter, M.D., M.P.H. The record reflects that each opinion proffered by the Joiners' experts as scientific knowledge was supported by the respective expert's specialized education,

years of experience, physical examination of Joiner, and familiarity with the general scientific literature in the field, as well as by reliance upon specific scientific studies relating to the carcinogenic effect of PCBs.[7] According to their curriculum vitae, each appears to have a national reputation, and the district court qualified them as experts.[8] Both experts familiarized themselves with the specifics of Joiner's history and disease, and reviewed the medical literature they deemed pertinent. Teitelbaum, through his affidavit and deposition testimony, set forth the general methodology he utilized in arriving at his expert opinion:

> [I conducted] a comprehensive and traditional occupational medical assessment of Mr. Joiner.... As part of this assessment I interviewed and examined him ... for several hours. In addition, I reviewed his past medical records, the data which was available about his workplace and materials with which he worked, depositions of Mr. Joiner, and others, and depositions of family members and co-workers about the nature of his work. I also considered many other documents relevant to the questions which I was asked concerning Mr.

---

[7]Although we consider the admissibility of each expert's testimony separately, we do see similar factors supporting the admission of both experts' testimony, and for convenience we often refer to them collectively.

[8]The evidence indicated that Teitelbaum is co-founder of the American Academy of Clinical Toxicology and the American Board of Medical Toxicology. He has published more than 40 articles in his field and teaches numerous graduate level courses in occupational and environmental toxicology and the epidemiology of toxic diseases. He is also a practicing toxicologist and has repeated experience treating patients from the electrical trades. Additionally, he has lectured on medical toxicology/epidemiology for federal judges.

> Schecter is professor of preventative medicine at State University of New York, Binghamton, and works full time researching the health effects of various toxic substances encountered in the workplace. He has published over 100 articles and abstracts subjected to peer review on the effects of workplace exposure to toxic chemicals, and has served on the editorial boards of numerous scientific and medical journals.

Joiner's illness and its relationship to his occupational exposures to toxic substances.... I utilized traditional medical assessment techniques. I also relied upon my extensive experience with workers in the electrical trades and my knowledge of the toxicology of the materials with which Mr. Joiner worked. I considered the fundamental mechanisms of toxicology and carcinogenesis as a manifestation of toxic outcome, the biology of cancer including the biology of small cell lung cancer, and the state of the art regarding the testing and evaluation of toxic substances for carcinogenic risk in humans.

Schecter also interviewed Joiner and reviewed his deposition and affidavit testimony. He conducted a review of Joiner's medical records, a videotape of the working conditions involving Joiner's repair of electrical transformers, the results of PCB testing done on the transformers, the relevant scientific literature on the toxic effects of the substances contained in defendants' products, and all deposed expert testimony. In arriving at his opinion, Schecter claimed to have eliminated other potential causes of Joiner's lung cancer to a reasonable degree of medical certainty.

In addition, each doctor utilized numerous scientific studies and authorities. Although the district court apparently considered only four epidemiological studies and two animal studies, Teitelbaum referred to several additional studies which he utilized in forming his views. Among those not mentioned by the district court were studies by researchers Gustavsson and Hogsted, findings of the International Program on Chemical Safety ("IPCS") World Health Organization Criterion, and "a whole series of [epidemiological studies] listed in [the World Health Organization] document."

Similarly, in addition to the studies mentioned in the district court's opinion, Schecter relied, in part, upon "recent

work such as that of Dr. George Lucier and colleagues at the National Institute of Health," "IARC studies, International Agency on Cancer at the World Health Organization," studies by "Dr. James Huff of the National Institute of Health," the Zober and Theiss studies from Germany, and also "Manz['] study on European workers."

b. *Were the Methods and Procedures Underlying the Experts' Testimony Reliable?*

Likewise, the record reflects that Teitelbaum and Schecter each utilized scientifically reliable methods and procedures in gathering and assimilating all of the relevant information in forming their respective opinions. Teitelbaum stated that his methodology "has been the basis of diagnosis for hundreds of years." Schecter described his methodology as one "usually and generally followed by physicians and scientists." Each asserted the general acceptance of the procedures they employed and defendants do not challenge these claims.

Furthermore, the extensive experience and specialized expertise of each of these experts augment the reliability of their reasoning and methodology. While this factor is most pertinent in deciding the separate question of whether the experts are qualified to testify, *see* Fed.R.Evid. 702, it also has some bearing on the determination of the reliability of the underlying reasoning or methodology. *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1125 (9th Cir.1994) (considering "expertise" to conclude that methodology underlying expert opinions satisfied *Daubert* ); *Downing,* 753 F.2d at 1239 (recognizing that "[t]he qualifications and professional stature of expert witnesses ... may also constitute circumstantial evidence of the reliability of the technique").

The assessment of reliability also involves reviewing the basis for an expert's opinion. As previously noted, when an expert relies on specific research to form an opinion, the district court must ascertain whether such research is reliable. To accomplish this, the court examines whatever evidence is proffered supporting or criticizing the research, keeping in mind the purpose of the inquiry, i.e., to exclude opinions based on mere speculation. While this inquiry cannot be made without some consideration of the quality of the research in question, the district court's focus is a narrow one and does not encompass deciding which expert's conclusions are better reasoned or more appealing. Nor should the court make independent scientific judgments on the basis of individual studies. For example, the court "rejected" the two animal studies because (1) there were only two studies, (2) which used massive doses of PCBs, (3) which represented a preliminary stage of research, and (4) which tested animals, not humans. None of these reasons is sufficient to render an expert's opinion legally unreliable. The question is whether the expert's use of these studies to help formulate an opinion is methodologically sound. The number of studies is irrelevant to this inquiry. As the Supreme Court made clear in *Daubert,* the fact that there are a limited number of studies does not undermine the utility of those studies in assisting an expert to form an opinion. *See Daubert, --- U.S. at ----,* 113 S.Ct. at 2797. Furthermore, it is improper to find research unreliable solely because it uses animal subjects. *See Paoli,* 35 F.3d at 781 (finding that the district court abused its discretion in excluding animal studies indicating probable link

between PCBs and cancer).

Opinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when viewed in their entirety are the building blocks of a perfectly reasonable conclusion, one reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply. As the Supreme Court said in *Daubert,* "[t]hese conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert,* --- U.S. at ----, 113 S.Ct. at 2798.

In this case, the Joiners' experts discussed the studies of at least thirteen different researchers, and referred to several reports of the World Health Organization that address the question of whether PCBs cause cancer. The Joiners' experts testified that many of these studies were conducted and analyzed to test specific hypotheses about the relationship between PCBs and cancer, that many have been published in reputable scientific journals, and that they were generated and tested using the scientific method. In ruling the Joiners' expert testimony inadmissible, however, it appears that the district court first viewed each expert's opinions as based only on the six studies discussed in her opinion[9] and then

---

[9]With one exception, the district court did not have before it any of the studies it cited in its order granting defendants summary judgment. Instead, the court apparently relied on the very brief criticisms of these studies defendants provided in their summary judgment motion. *Joiner,* 864 F.Supp. at 1325 n. 27 (noting that "[w]ith one exception, neither party has provided the court with a copy of the studies cited in the briefs [and

accepted defendants' criticisms of the conclusions reached in those studies, stating that "the studies simply do not support the experts' position that PCBs *more probably than not* promoted Joiner's lung cancer." *Joiner,* 864 F.Supp. at 1326. As *Daubert* makes clear, the district court may not decide whether an expert's opinions are correct, but merely whether the bases supporting the conclusions are reliable. *Daubert,* --- U.S. at ----, 113 S.Ct. at 2797 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

Instead of viewing the bases of an expert's opinion as a whole to screen out mere speculation, the district court assessed only a portion of the studies relied upon by each of the Joiners' experts, and then excluded the testimony because it drew different conclusions from the research than did each of the experts. Ultimately, the court should satisfy itself as to the legal reliability of proffered expert testimony, leaving the jury to decide the correctness of competing expert opinions.

2. *Application of Daubert to this Case—Relevance*

The second prong of *Daubert* requires the court to determine whether the "testimony "assist[s] the trier of fact to understand the evidence or to determine a fact in issue,' " by examining whether the "reasoning or methodology [underlying the testimony] can be applied to the facts in issue." *Daubert,* --- U.S. at ----, 113 S.Ct. at 2795-96. The district court found that the experts'

---

that] the court, for the most part has had to rely on the excerpts from the studies that the parties have provided in their briefs"). It further appears that the court did not consider Teitelbaum's testimony as to why the studies supported his opinion that PCBs cause cancer.

opinions did not "fit" the facts in the case because "the opinions [linking PCBs to cancer] are inextricably bound up with the experts' assumption that Joiner was exposed to furans and dioxins," *Joiner,* 864 F.Supp. at 1320, an assumption the court deemed unfounded. Our review of the record indicates, however, that there appears to a genuine factual dispute as to whether PCB's alone can cause cancer, and that this issue was inappropriate for summary judgment. Although the terms "PCBs," "dioxins," and "furans" often appeared together in each expert's proffered testimony, and at times the Joiners' experts asserted that it can be assumed furans and or dioxins were present in the City's PCB contaminated transformer fluid, it does not necessarily follow that each expert's opinion that PCBs caused Joiner's cancer was contingent upon his exposure to furans or dioxins. During his deposition, Teitelbaum testified that:

> [t]here's sufficient information on PCBs. I brought the IPCS World Health Organization criterion because it's just hot off the press, and the summary ... indicates that as of 1987, IARC had concluded that the evidence for carcinogenicity in laboratory animals is sufficient. This is the latest piece of information, and there is no reason to doubt that, and they also concluded that PCBs are probably carcinogenic for humans.

Schecter similarly testified that "PCBs alone also cause cancer" in explaining that PCBs can initiate, as well as promote, cancer. Thus, in terms of Joiner's claim that PCBs alone can cause cancer, it becomes immaterial whether there were furans and dioxins in the fluid.

Similarly, with reference to the theory that Joiner was indeed exposed to furans and dioxins, it appears that a genuine dispute likewise exists over whether furans and dioxins could have

been present in the dielectric fluid. For example, both of the Joiners' experts testified that furans can be generated when PCBs are exposed to fires and lightning, and that furans and dioxins are often found together with PCBs. Schecter stated that "[i]t is well documented that the heating of or burning of PCBs will create both the [furans] and deadly dioxins." Teitelbaum testified that furans would inevitably result given the fact that the City's transformers had suffered fires and lightning strikes on several occasions. Teitelbaum testified during his deposition that "one simply has to look at the chemistry of the situation and what's known about PCBs manufactured in this period and assume that there was some furan present, that there may have been some dioxin present, depending on the particular fire and circumstances." *Id.* at 1321.

Defendants sought to neutralize the impact of the Joiners' evidence by establishing that neither furans nor dioxins would have been produced unless the transformer fluid exceeded a certain temperature. Defendants' expert, Dr. John F. Brown, Jr., testified that the exposure of PCBs to temperatures of 300 degrees centigrade for several days could generate furans, but that it was unlikely the City would have allowed the temperature ever to reach 300 degrees during a bake-out because of potential damage to the transformer core. Brown did not comment, however, on the temperatures that may have been reached during an accidental transformer fire which, because it is not planned by the City, does not involve intentional damage to the transformer core. Nor did the defendants provide evidence of what the temperatures in these fires might have been, or establish that the temperatures, in fact,

never exceeded 300 degrees. The defendants never succeeded in rebutting the conclusions of the Joiners' experts by either establishing a threshold temperature for the conversion of furans or dioxins in a PCB solution, or presenting any direct evidence of the actual temperatures attained during either the bake out process or accidental fires. In contrast, Teitelbaum, when asked if he was able to "determine the temperature created from the stadium lights that were used to bake the transformer coils," replied, "[Joiner] says it was hot enough for it to smoke, and oil smokes at around 700 degrees, 800 degrees [centigrade]." In addition, while defendants' expert, Dr. Thomas O. Rouse, testified that it would be "quite unlikely" for a lightening strike to cause the production of furans from PCBs, *Id.* at 1317 n. 12, Teitelbaum testified in his affidavit that "Mr. Joiner was directly involved in the salvage of PCB containing transformers which had been involved in a lightning strike, [and that] a lightning strike and overheating of a transformer in the presence of oxygen in the dielectric fluid, inevitably produces [furans]."

For all of the foregoing reasons, the testimony of plaintiff's experts was erroneously excluded and summary judgment should not have been granted. Accordingly, we reverse the summary judgment and remand for proceedings consistent herewith. REVERSED and REMANDED.

BIRCH, Circuit Judge, specially concurring:

I concur in this opinion because it properly emphasizes the role of the district court as "gatekeeper." The role of the trial judge, properly following the *Daubert* mandate, is to ensure that

the conclusions reached by the scientific experts have some minimal level of reliability and probative value. This determination is accomplished by establishing that the predicate principles and methodology relied upon by the experts are valid and that they can be applied to the facts at issue. The *sufficiency* of the evidence and the *weight* of the evidence, however, are beyond the scope of the *Daubert* analysis. Whether the conclusions advanced from the stated premises in fact follow and the persuasiveness of those conclusions in the ultimate resolution of competing opinions, are questions appropriately left to the finder of fact. The trial court, nevertheless, retains its responsibility of properly instructing the jury on burden of proof and ultimately entering judgment in appropriate circumstances—all *after* the evidence has been tested through cross-examination and rebuttal evidence has been introduced.

In discharging the *Daubert* mandate, the trial court can enhance the record for appellate review by appointing an expert, under Fed.R.Evid. 706, to assist the court in evaluating proffered scientific evidence. Augmentation of the record with the testimony of a competent, independent and philosophically neutral Rule 706 expert focused upon evaluating the reliability of the proffered expert evidence will likely promote a more comprehensive and adequate ruling by the trial court. As complex scientific and technical evidence becomes more commonplace, in this ever-advancing computer age, the need for the trial court generalist to seek expertise in discharging *Daubert* responsibilities becomes increasing evident and compelling.

SMITH, Senior Circuit Judge, dissenting:

I respectfully dissent because the majority improperly applies *Daubert v. Merrell Dow Pharmaceuticals,* --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and does not adequately clarify the roles of the expert, the trial court and the appellate court. The following analysis is based on a few basic ideas. As a "gatekeeper," the trial court must sift through expert testimony to decide not only whether an expert may testify, but what portion of the expert's testimony is admissible. A single expert may offer several opinions to reach his ultimate conclusion, and each opinion must be admissible under *Daubert.* Further, an expert's testimony does not "assist" the trier of fact if the expert does not explain the steps he took to reach his conclusion. We should not require the trier of fact to accept blindly the expert's word to fill the analytical gap between proffered "scientific knowledge" and the expert's conclusions. Therefore, the trial court "gatekeeper" has broad discretion to decide whether a leap of faith across the analytical gap is so great that, without further credible grounds, the testimony is inadmissible.

## I. Standard of Review

The majority states that, although we review the trial court's admissibility rulings for abuse of discretion, "we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony" and "our review is plenary" over the trial court's interpretation of evidence rules. Because understanding the scope of appellate review helps define the role of the trial court, I believe we should follow other circuits and

present a more precise explanation of the standard of review. *See, e.g., Cook v. American Steamship Co.,* 53 F.3d 733, 738 (6th Cir.1995) (Three standards in reviewing admissibility of expert opinion: (1) trial court's factfinding is reviewed for clear error; (2) trial court's ruling whether opinion is scientific knowledge is question of law requiring plenary review; and (3) trial court's ruling whether opinion assists the trier of fact is reviewed for abuse of discretion); *Bradley v. Brown,* 42 F.3d 434, 436-37 (7th Cir.1995) (Plenary review of whether trial court applied Daubert framework, but trial court's findings not disturbed unless manifestly erroneous.).

In applying a "particularly stringent" review, we do not change the threshold of review, but conduct a searching review of the record (i.e., take a "hard look") while maintaining the proper standard of review. *See, In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 749-50 (3d Cir.1994) (give a " "hard look' (more stringent review)" to decide whether the trial court abused its discretion), *cert. denied,* --- U.S. ----, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). This court already suggested such a "hard look" where it remanded a case in light of *Daubert* and instructed the trial court to make specific factfindings to facilitate appellate review. *United States v. Lee,* 25 F.3d 997, 998 (11th Cir.1994). Under this "hard look," I offer for clear guidance review terminology that is firmly established in the jurisprudence of this and other circuits. Whether the trial court properly applied Rule 702 by following the framework set forth in *Daubert* is a question of law over which this court exercises complete and

independent review. *See, Peterson v. Atlanta Housing Authority,* 998 F.2d 904, 912 (11th Cir.1993) ("The district court's conclusion of law is subject to complete and independent review by this court.") (quoting, *In re Sure-Snap Corp., 983* F.2d 1015, 1017 (11th Cir.1993)); *Bradley,* 42 F.3d at 436-37. I suggest the term "complete and independent" as being more precise and accurate than the ubiquitous "de novo" where the review is in fact the first one ever conducted. "De novo" carries a connotation of repetition, as in a "trial de novo" after a matter has previously been tried. To suggest that an appellate court is conducting a "new" review of the trial court's conclusions of law is less than accurate when in fact those conclusions have never before been *reviewed.* The trial court's preliminary factfinding during a Rule 104(a) hearing to determine the admissibility of expert opinion is reviewed for clear error. *See, Elston v. Talladega County Bd. of Ed.,* 997 F.2d 1394, 1405 (11th Cir.1993) ("We review the district court's findings of fact for clear error. A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)) (internal quotations omitted); *Cook,* 53 F.3d at 738. In applying the *Daubert* framework, the trial court's ruling on whether the expert opinion is (1) reliable (i.e., scientific knowledge grounded in the methods and procedures of science) and (2) relevant (i.e.,

"fits" the facts of the case) is reviewed for abuse of discretion.[1]
*See, Hibiscus Associates Ltd. v. Board of Trustees,* 50 F.3d 908,
917 (11th Cir.1995) ("A judge has broad discretion to exclude
expert testimony, and his action will be upheld unless it is

---

[1]Those circuits addressing *Daubert* have shown similar
deference to the trial court's admissibility determinations.
*See, e.g., Pedraza v. Jones,* 71 F.3d 194, 197 (5th Cir.1995)
(trial court's ruling drug addict's expert testimony inadmissible
is reviewed for abuse of discretion); *Gier v. Educational
Service Unit No. 16,* 66 F.3d 940, 942 (8th Cir.1995) (trial
court's ruling psychologist testimony inadmissible reviewed for
"clear abuse of discretion"); *Deimer v. Cincinnati Sub-Zero
Products, Inc.,* 58 F.3d 341, 344 (7th Cir.1995) ("[W]e apply a
deferential standard of review ... A decision to allow expert
testimony is within the broad discretion of the trial judge and
is to be sustained ... unless manifestly erroneous.") (internal
quotations omitted); *Cook v. American Steamship Co.,* 53 F.3d
733, 738 (6th Cir.1995) ("[W]hether the proffered expert opinion
"will assist the trier of fact to understand the evidence or to
determine a fact in issue,' is a relevancy determination and
therefore one we review for abuse of discretion."); *United
States v. Dorsey,* 45 F.3d 809, 814 (4th Cir.1995) ("[E]ven under
the *Daubert* analysis, a trial judge has a great deal of
discretion in deciding whether to admit or exclude expert
testimony.") (citing *United States v. Bynum,* 3 F.3d 769, 773
(4th Cir.1993) ("The [*Daubert* ] Court emphasized that it was
prescribing a "flexible' rule, one committed, as are most
questions of admissibility of evidence, to the discretion of the
district courts."), *cert. denied,* --- U.S. ----, 114 S.Ct. 1105,
127 L.Ed.2d 416 (1994)), *cert. denied,* --- U.S. ----, 115 S.Ct.
2631, 132 L.Ed.2d 871 (1995); *American & Foreign Insurance Co.
v. General Electric Co.,* 45 F.3d 135, 137 (6th Cir.1995) ("A
trial court has broad discretion in the matter of the admission
or exclusion of expert evidence, and ... is to be sustained
unless manifestly erroneous.") (internal quotations omitted);
*Bradley v. Brown,* 42 F.3d 434, 436-37 (7th Cir.1995) ("We first
undertake a de novo review of whether the district court followed
the framework set forth in *Daubert* [, and if so,] we will not
disturb the district court's findings unless they are manifestly
erroneous."); *In re Paoli,* 35 F.3d 717, 749-50 (3d Cir.1994) (a
"hard look" at trial court's exercising its discretion); *United
States v. Rincon,* 28 F.3d 921, 923 (9th Cir.1994) (admissibility
of expert opinion on eyewitness identification reviewed for abuse
of discretion), *cert. denied,* --- U.S. ----, 115 S.Ct. 605, 130
L.Ed.2d 516 (1994); and *United States v. Muldrow,* 19 F.3d 1332,
1337 (10th Cir.1994) ("We review a trial court's admission of
evidence under an abuse of discretion standard."), *cert. denied,*
--- U.S. ----, 115 S.Ct. 175, 130 L.Ed.2d 110 (1994).

manifestly erroneous.").

## II. Admissibility of Expert Testimony

After presenting a thorough review of the *Daubert* standard, the majority errs by first applying the reliability prong of *Daubert* to the experts' opinions as a whole, and then applying the relevancy prong. This approach treats all the experts as offering only one opinion leading to the ultimate conclusion that transformer dielectric fluids promoted Mr. Joiner's small cell lung cancer. However, each expert is actually offering several opinions leading to that ultimate conclusion. For example, the experts offer opinions that (1) furans and dioxins were present and (2) furans and dioxins promoted Mr. Joiner's cancer. Each of these assertions is a separate opinion which must meet the *Daubert* standard, regardless of whether the assertions are given by the same or different experts. As the *Paoli* court stated,

> [T]he requirement of reliability, or "good grounds," extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case ... [A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.

*Paoli,* 35 F.3d at 743, 745 (emphasis omitted).

The majority admonishes the trial court for not "viewing the bases of an expert's opinion as a whole." However, sifting through the expert's testimony is a crucial "gatekeeping" function that not only requires the trial court to decide which experts may testify, but also requires the trial court to decide what the experts may testify about (i.e., the trial court must separate the wheat from the chaff). Litigants may not offer all of an expert's testimony so long as they can search and find some portion that is

admissible. Similarly, an expert may not bombard the court with innumerable studies and then, with blue smoke and slight of hand, leap to the conclusion. Instead, the expert must explain how the opinion drawn from each study is acceptable under *Daubert* (i.e., how the study is methodologically grounded and "fits" the facts of the case), else the expert cannot testify about that particular study.

*A. Exposure to PCBs, Furans and Dioxins*

Although finding there is a genuine dispute whether Mr. Joiner was exposed to PCBs, the trial court found insufficient evidence that Mr. Joiner was exposed to furans or dioxins. The trial court dismissed Mr. Joiner's assertion that furans were created from PCBs in fire conditions because, although there was evidence of fire and other "hot" conditions, Mr. Joiner failed to show that conditions reached the requisite temperatures in this case (i.e., "fit"). *Joiner v. General Electric Co.,* 864 F.Supp. 1310, 1317-18 (N.D.Ga.1994).

The majority concludes the trial court committed reversible error by overlooking a minor passage from Dr. Teitelbaum's affidavit that provides specific evidence of "fit": (1) the transformer's were smoking which requires temperatures of 700 to 800 degrees centigrade and (2) some transformers were struck by lightning which inevitably produces furans. The majority further suggests the trial court's ruling was erroneous because the defendants presented no evidence that the fires did not reach the requisite temperature. However, I disagree and I am not prepared to reverse the trial court on this issue because it is Mr. Joiner

who has the burden of proving admissibility. *Daubert* at ----, 113 S.Ct. at 2796 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76, 107 S.Ct. 2775, 2778-79, 97 L.Ed.2d 144 (1987)); *see also, Deimer,* 58 F.3d at 345 (The expert "had the responsibility to apply his analysis to the facts of this case."); *American & Foreign Insurance Co.,* 45 F.3d at 139 ("[T]he burden is on the [party seeking to admit expert testimony] to persuade this court that the testing was reliable and supported by raw data."). In making its ruling, the trial court sifted through such overwhelming evidence that it inevitably overlooked the passage from Dr. Teitelbaum's affidavit. More importantly, Mr. Joiner himself failed to disclose this passage notwithstanding his burden of proving admissibility or his knowing the case hinged on such evidence. Mr. Joiner failed to cite this or any similar passage on appeal. Indeed, this passage would have been forever lost had it not been for the diligent, searching eye of the majority. I am not prepared to place such a burden on either the trial or appellate courts. Similarly, I am not prepared to encourage litigants to inundate the courts with raw data and force the courts to process the data to determine why certain evidence is admissible. The litigants and their experts should know their evidence better than anyone—they should be their own advocates for its admission.

I would also affirm the trial court on the issue of exposure to dioxins. The trial court properly discarded treatise excerpts as inadmissible hearsay because they were not offered through expert testimony. The trial court did not abuse its discretion in discarding testimony that dioxins can be formed from Pyranol

because there was no evidence that Pyranol was or may have been present in this case (i.e., "fit"). Nor did the trial court abuse its discretion in excluding testimony that burning PCBs produces dioxins where the testimony did not reference any supporting studies (i.e., grounded in science). Finally, the trial court did not abuse its discretion in finding that expert testimony concerning a specific incident "has little probative value given the evidentiary deficits in this case." *Joiner* at 1319.

B. *Causation—Promotion of Cancer*

The trial court gave two alternative grounds for granting summary judgment on the issue of causation (i.e., whether Mr. Joiner's exposure to dielectric fluid promoted his cancer): (1) the experts' testimony did not "fit" because they assumed Mr. Joiner was exposed to furans and dioxins and (2) the experts did not show how the studies they relied on "fit" this case. Regarding the former ground, I am not prepared to reverse the trial court due to Mr. Joiner's failing to disclose the critical passage regarding the temperature of the transformers which would have provided the "fit" required to admit evidence about furan and dioxin exposure. Moreover, I would affirm the trial court on the latter ground because it did not abuse its discretion in finding the experts failed to show how the proffered studies "fit" this case.

1. *Mice Studies.*—The trial court found the experts' reliance on mice studies was questionable because (1) there were only two studies; (2) the studies used massive doses; and (3) the studies yielded only preliminary results. *Joiner* at 1323. The trial court excluded the studies because Mr. Joiner did not respond to these

concerns, but merely "proceed[ed] as if the only issue is whether animal studies can *ever* be [proper]." *Joiner* at 1324 (emphasis added). The majority opinion apparently adopts Mr. Joiner's argument, stating that "it is improper to find research unreliable solely because it uses animal subjects." However, this ignores the trial court's concern that the experts have not demonstrated how these mice studies "fit" this particular case.

In discussing "fit," the Supreme Court stated,

> The study of the phases of the moon ... may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However ( *absent creditable grounds supporting such a link* ), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

*Daubert* at ----, 113 S.Ct. at 2796 (emphasis added). In explaining the concept of "fit," the *Paoli* court stated,

> [Expert] testimony will be excluded if it is not scientific knowledge for the purposes of this case.... [I]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves.

*Paoli,* 35 F.3d at 743 (emphasis in original).

The trial court's ruling was not that animal studies are inadmissible *per se,* but that Mr. Joiner's general response that experts generally rely on animal studies fails to show the reliability and "fit" of these particular animal studies. *Joiner* at 1324 n. 25. The trial court's concern is that the proffered studies (1) were on mice, not humans; (2) were of substantially higher doses of PCBs than Mr. Joiner's exposure; (3) resulted in a different form of cancer than Mr. Joiner's; (4) yielded only

preliminary results and (5) were not accompanied by other studies (there were only two studies). Because Mr. Joiner failed to address the latter two concerns, the trial court found the studies were unreliable. Regarding the other concerns about "fit", the trial court found that Mr. Joiner did not present "creditable grounds for supporting" the link between these mice studies and Mr. Joiner's cancer.[2]

It is incumbent on the proponent of scientific evidence to fill the analytical gap between a proffered study and the particular facts of the case (i.e., "fit"). *Daubert* at ---- n. 10, 113 S.Ct. at 2796 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76, 107 S.Ct. 2775, 2778-79, 97 L.Ed.2d 144 (1987)); *see also, Deimer,* 58 F.3d at 345 (The expert "had the responsibility to apply his analysis to the facts of this case."); *American & Foreign Insurance Co.,* 45 F.3d at 139 ("[T]he burden is on the [party seeking to admit expert testimony] to persuade this court that the testing was reliable and supported by raw data."). The trial court exercises its discretion to determine whether such a showing has been made, weighing several factors including the "liberal thrust" toward admitting expert evidence, the adversarial system's ability to scrutinize admitted evidence, and the powerful influence of expert opinion.[3] *Daubert* at ----, ----, 113 S.Ct. at

---

[2]Had this law suit involved mice exposed to high doses of PCBs who developed some type of lung cancer, the "fit" would have been self-evident. However, the relationship between the studies and the facts of this case is much more tenuous.

[3]In this regard, the *Daubert* Court stated,

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

2794, 2798.  Where no other scientific evidence is offered to fill the analytical gap, the trier of fact is required to take the expert simply on his word, placing blind faith in his expertise. However, if the trial court finds the expert testimony requires too great a leap of faith across the analytical gap, it may properly request good grounds to bridge the gap before admitting the testimony.  *See, Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360-61 (6th Cir.1992) (Regarding animal studies used to show the cause of birth defects, the court found "[t]he analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide.  Under such circumstances, a jury should not be asked to speculate on the issue of causation."), *cert. denied,* 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992).  This is not too onerous a request because the expert should certainly have reasons for drawing his conclusions from the study, else his testimony is inadmissible as the "subjective belief or unsupported speculation" that *Daubert* requires the trial court "gatekeeper" to screen out.[4]  *Daubert* at ----, 113 S.Ct. at 2795.

> proof are the traditional and appropriate means of attacking shaky but admissible evidence....  Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than over lay witnesses.

*Daubert* at ----, 113 S.Ct. at 2798.

[4]Common law precluded an expert from testifying at all about an ultimate fact in issue, relegating his role to guiding the trier of fact up to the ultimate fact without taking the final step.  Although an expert may now testify to an ultimate fact, this permissiveness certainly does not permit an expert to testify solely to an ultimate fact without guiding the trier of fact to that conclusion.  For example, an expert could not give a

Therefore, the trial court did not abuse its discretion in ruling the mice studies testimony inadmissible where Mr. Joiner completely failed to respond to the trial court's concerns.

2. *Epidemiological Studies.*—The trial court disregarded the experts' reliance on epidemiological studies because "in every case ... the studies are either equivocal or not helpful" and "simply do not support the experts' position that PCBs *more probably than not* promoted Joiner's lung cancer." *Joiner* at 1324, 1326 (emphasis in original). The majority reverses the trial court on this issue, alleging the trial court improperly decided whether the experts' conclusions were correct instead of limiting its analysis to whether the studies were reliable. I respectfully disagree; the trial court's concern is with "fit," not whether the experts are correct.

The *Paoli* court recognized that the distinction between focusing on an expert's methodology instead of his conclusion "has only limited practical import." *Paoli* at 746. The court explained,

> When a judge disagrees with the conclusions of an expert, it will generally be because he or she thinks there is a mistake at some step in the investigative or reasoning process of that expert.... [A] challenge to "fit" is very close to a challenge to the expert's ultimate conclusion about the particular case, and yet it is part of the judge's admissibility calculus under *Daubert.*

one sentence testimony, "Mr. Joiner's lung cancer was promoted by his exposure to dielectric fluid, you can take my word for it." Nor would he save his testimony by adding, "I've heard of studies that show saccharine causes cancer in laboratory animals." In order to "assist" the trier of fact, the expert must further explain his reasoning by testifying about what studies he relies on to form his opinion, how reliable are the studies, and how the studies relate to this particular case.

*Paoli* at 746. By directing attention away from the trial court's choice of terminology and toward its actual analysis, I conclude that the trial court did not abuse its discretion in ruling each study inadmissible.

The trial court found the Bertazzi capacitor manufacturers study inadmissible because its results showed "no grounds" for linking exposure to lung cancer, and the specific excerpts relied on by the experts merely show the "plausibility," not probability, that exposure could cause cancer. *Joiner* at 1324 n. 26. These concerns alone are not dispositive because an expert may analyze a study and draw different conclusions than the study. However, an expert should have reasons for differing with the study or for finding that the study supports his conclusion notwithstanding language in the study to the contrary. Because Mr. Joiner failed to respond and provide supporting grounds, the trial court did not abuse its discretion in ruling this evidence inadmissible.

The trial court ruled the Zack & Musch Monsanto study inadmissable where the study itself stated that the results were not "statistically significant." *Joiner* at 1325. The trial court ruled the Norwegian cable manufacturers study inadmissible because it "never mentions PCBs," involves mineral oil exposure, and the study itself concludes that "[f]urther follow up ... studies ... are needed before any firm conclusions may be drawn." *Joiner* at 1325. The trial court also ruled the Yusho accidental toxic exposure study inadmissible because the study was a "preliminary report," the study involves persons exposed to furans and dioxins, and Mr. Joiner's own expert testified that the study "is not very

convincing as the Japanese lifestyle is different ... [it is] suggestive but not convincing." *Joiner* at 1326 (quoting Deposition of Dr. Teitelbaum).  As with the Bertazzi study, the trial court did not abuse its discretion where Mr. Joiner failed to respond to the trial court's concerns and provide further grounds for relying on these studies.

### *III. Conclusion*

The trial court properly applied *Daubert* and did not abuse its discretion in ruling certain expert testimony inadmissible.  Based on these rulings, there is insufficient evidence on the issue of causation.  Therefore, I would affirm the trial court's granting summary judgment in favor of defendants.  Moreover, I caution against using the majority's approach that applies each *Daubert* prong to the testimony as a whole.  I would approve the trial court's step-by-step approach which properly anticipates a single expert as offering more than one opinion to support his ultimate conclusion.